Policeman's Annuity and Benefit Fund v. Siebel Systems. May it please the Court, Mark Rosen for the plaintiff. I'd like to reserve two minutes for rebuttal. Could you speak up? I certainly can. Thank you, Your Honor. I'll pull the mic closer. Are you the one who gave us the Yes, I am, Your Honor. I literally thought of it. I woke up before this morning and thought of it and realized that there was a much simpler explanation in response to the defendant's argument that the confidential sources had to have direct personal knowledge of the events. And I went back and I read this Court's decision from October Betts, which says at 1021 that Silicon Graphics held that the plaintiff to plead cyanide must plead in great detail facts that constitute strong circumstantial evidence. I then went to Black's Law Dictionary, which I haven't done since I was a first-year law student, and it defines circumstantial evidence as evidence not based on knowledge or personal observation, on direct knowledge or personal observation. I think that together explains why these confidential sources can be credited, certainly consistent with Tel-Avs and other precedents, without having to say they were direct observers of all the events. I would like to address two principal points. That is, what the Supreme Court decided in Tel-Avs and applying Tel-Avs to the facts of this case, we believe, why the district court erred. As we explained in our 28-J letter, Tel-Avs set forth at least three principles. First, that the Court should take a holistic approach rather than what I would call an atomistic approach to the allegations of cyanide. Second, that it should not reject allegations considered too vague or ambiguous, and it said that in response to Justice Alito's concurrence. And third, that the inferences of cyanide should be accepted as long as they're as compelling as the competing inference, again rejecting Justice Scalia's suggestion that this breaks the normal rule that the tie goes to the defendant. We believe on the record that the district judge below crossed the line on all three of those. He refused to look at the evidence in total. Best evidence of that is when we recited four or five separate sources as to the shifting of about $50 million in revenue at the end of 2001. He looked at it and he said, and I'm not going to get the numbers right, witness one said they shifted revenue, but he didn't identify the customer. Witness two identified the customer, but he didn't identify the date. Witness three and so forth and so on, you know, turning the collective witnesses into a series of blind men and the elephant, and that's precisely what Talab said should not be done. Second, he rejected allegations as too vague. And third, applying this Court's prior precedent in Gompers v. Vizics, which has now been changed by Talab's, he said that the plaintiffs cannot survive unless the inference of cyanide are more compelling, not as compelling as the inference of non-cyanide. Now, there are three basic allegations in this complaint, the statements about revenue, the statements about their Siebel 7 project, and statements about the survey. And each of those I believe the judge made a mistake. In terms of revenue cushioning, even the district court below conceded that if, in the argument on the original motion to dismiss, appeared to concede that if we could identify the transactions, that that would in fact be significant, and it was in fact significant to the market. Because not only in January did they announce the results of the last quarter in the year of 2001, but they talked about how there had been an upturn in 2002, starting in November of 2001, continuing into January. By taking that approximately $50 million in revenue and holding it in their cookie jar, they were able to create the impression that unlike Siebel's competitors, the company had turned the corner and was recovering from the economic shock that obviously occurred after 9-11. And by not disclosing that the first quarter of 2002 results were based upon that revenue that had been shifted by creating the cushion, it created a false impression as to how well the company was doing. They then made a series of subsequent statements. In April, they made a statement, well, we expect that the, excuse me, they said the adoption of Siebel 7 was accelerating and there has been strong acceptance. Those are statements of fact, not opinion. And having said in the beginning of November that they expected 90% adoption within six to nine months, they were already at the six-month point and yet they were nowhere near that as evidenced by the fact at the end of the class period on July 17, they announced there had only been 20% adoption rate. Well, I understand that you cannot hold them liable for a projection other than coming within the grounds for not being exempt under the safe harbor rule, but the statement that there had been rapid acceptance is a statement of present fact. And as proven by the fact that two months later there had been such low acceptance, you can't be accelerating up to April and then all of a sudden come out at 20% and not at 90%. So we believe those statements were not supported and they're inherently inconsistent with the facts as they turned out. The statements as related to Siebel 7 talk about items such as functionality. We cite on paragraph 61 of the complaint and the excerpt of record 264 how analysts specifically referred to the functionality of the product in commenting upon Siebel's stock. This is something that is directly relevant in computer software. This is not a loose, puffing sort of statement and we believe that the court erred as well. Why don't the statements you've talked about so far, let's put the survey aside for the moment, fall within the Ronconi-Larkin case which talked about honest optimism followed by disappointment and is not the same as lying or misleading with deliberate recklessness. I believe it's the Eisenstadt case, which I believe the defendants cited in their brief that explains. It says normal statements that things are going well are not misleading unless you're presiding over disaster. And as this Court said, I believe, in Apple in the Ninth Circuit, that a statement, even a statement of projection, is predicated upon and contains an implicit representation that it's held in good faith and that the speaker is not aware of facts inconsistent with it. Well, the fact that six months out in their six to nine month period, and they said we're going to get to 90% within six to nine months, the fact that they had not achieved those sales, that sales in fact had fallen, and then going to the statement on June 12th. They said they were going to get to 90%? They said in the beginning of November that they were going to get to 90% adoption or acceptance. Did they hope to? They expected to? They intended to is, I believe, their phrase. They said in the beginning of November, I don't recall the exact day, but it was November of 2001, they intended to reach 90% adoption or upgrading because there were some existing customers and some new customers. How is that different from a very hopeful expression of optimism? Well, first of all, I shouldn't come up with sports analogies, but, you know, at halftime, because I don't know much about it. How about Senator Craig? I intend to resign. How would any investor rely on that? I mean, you read the Wall Street Journal, and everyone sounds like everything's, the world is so rosy. What reasonable investor would rely on that type of statement? I don't think they rely upon a general statement that things are rosy. But when they make a statement in January of 2002 that they have, that sales have picked up, and when in April 2002 they report the results for the first quarter, and they do not disclose that those results were artificially inflated by the 50 million in revenue shifting, and then 18 days before the end of the second quarter on June 12th, they talk about how well they're doing when, in fact, that result is totally inconsistent with only having a 20% adoption rate, and they end up reporting significant shortfall. I think investors can rely upon that, and we pointed out in the? Do you think a reasonable investor relies on that type of statement from a corporate officer? Well, first of all, Your Honor, they do rely upon statements of earnings and statements of revenue. Statements of earnings they do rely on, yes. But what corporate officers say is what's going to be in the future. You think a reasonable investor relies upon their taken word? Well, it's certainly based, it's based upon an expectation that they're not aware of facts that are totally inconsistent with it, and that ties into the third point on the survey. I mean, maybe they're reliant in the sense that they have personal confidence in the director, but I think they're reliant in a very different way than the way you rely on facts. You know, if you sort of have confidence in an executive, you say, well, if he's optimistic, then, you know, I ought to buy this stock. But that's obviously not the kind of thing for which you can sue. Your Honor, I'm down to one minute, so if I could hold my response with my rebuttal, I'd appreciate it. Okay. Thank you, Your Honor. Good morning, Chief Judge Kaczynski, and may it please the Court, I'm Kathleen Sullivan, and I represent the defendants, Siebel Systems and the individual Siebel defendants. Your Honors, this is a classic case of fraud by hindsight, which was properly dismissed by Judge Breyer below as falling far short of sufficient pleading under the PSLRA, coming nowhere close to the tie referenced in the tell-labs decision. This is nowhere close to a tie. The strong inferences favor the defendants, and Judge Breyer properly dismissed the complaint. And I would just add that this is an especially unseemly attempt to plead fraud by hindsight, because it attempts to exploit the fluctuations in the markets and in business orders in the immediate aftermath of 9-11, the three quarters following it. Now, just to work through the individual allegations that Judge Breyer properly dismissed, Your Honors, you're absolutely correct that, as Judge Hawkins suggested, this is a case that, like in Ronconi, as Judge Cowen suggested, investors, reasonable investors, would not rely upon statements of optimism or corporate puffery that say, Siebel 7 will have deep functionality, Siebel 7 will have an easy path to upgrade. How about we've conducted an independent survey, and it has determined that 90 percent of our customers would purchase this product again? Well, Judge Hawkins, there's nothing false about any of the statements that Siebel made. Independent? Nothing false about saying it's independent. It's a separate company operated by third parties. On which Siebel was an investor. A minority stakeholder disclosed on the website with one overlapping director disclosed on the website, like many companies in Silicon Valley. And Siebel, but there's no allegation that Siebel controlled that survey. There are desperate allegations that Siebel gave over customer lists and helped Satmetrics conduct the survey by giving out trinkets. This is consistent with encouraging participation. And asked questions in the survey that were virtually compelled a yes answer. Your Honor. That if you answered no, you would be saying you were going to remove from your computer software that you had already purchased. Well, Judge Hawkins, let's go back and review the chronology, first of all. The Satmetrics survey is completed back in September before Siebel 7 is even released. There are later surveys, one conducted by an independent company, Nucleus, one conducted by Siebel itself. And Siebel realizes there are bugs and problems in the new issue of Siebel 7. And it, in fact, corrects them by the following September, releasing 7.5. There's nothing in the securities laws that bars a company from correcting problems with its products and trying to answer negative remarks from customers. So the only question here is whether there's some kind of attempt sienter in Siebel trying to control the results. Overlapping an investment stake does not show that there was no attempt to control the results. Yeah, but you would think that if they had an independent expert look at something, they would have, as lawyers do, or ethically, maybe I don't want to raise them to the ethics of lawyers, but they would indicate they have some interest in the expert. Your Judge, how I don't know that it has any interest in this particular, had any effect on this survey, but they could at least indicate that they have some relationship to the expert. Judge Cowen, there was no misstatement and, therefore, no obligation to correct. No misstatement, but a half-statement. When they said we had this expert look at this, but should they have dropped the footnote and say, incidentally, we have an overlapping director or something like that? Your Honor, there's no suggestion in the allegations that the market relied. Let's come back to what we're doing here. We're not trying to regulate company survey techniques. These are the securities laws, and we care about whether there was a false statement of fact that was material on which, as you say, Judge Cowen, a reasonable investor would have relied. No reasonable investor would have relied upon a statement that we have an independent audit showing that customers like our product and 96 percent will adopt our new product. No reasonable investor would think that was a guarantee of future results. And independent doesn't have the meaning in this context, which is essentially an advertising context. Independent doesn't have the meaning that it has in this context. Well, it's a little bit more than balderdash, saying, look, don't take our word. We'll take the word of this third-party expert to whom we have no relationship, and they will tell you as we that the following. It's not quite the same as corporate execs blowing off how great their products are. Well, Your Honor, as you yourself said, no reasonable investor would rely on corporate balderdash. And as Judge Kleinfeld said for this court in writing Ron Coney, to which Judge Hawkins referred, companies depend upon the animal spirits that fuel capitalism, and animal spirits sometimes lead you to advertise. Now, there was nothing false about the statement of what the survey said. It's not alleged that a single report about what customers said was untrue to what customers actually said. But the underlying question is, was the survey in itself false, conceived in fraud, so to speak? A survey can't be false. There can be questionable methodologies. But as Judge Breyer said below, it would be very dangerous for the federal court sitting and interpreting the securities laws to become micromanagers of companies' advertising techniques. There's nothing false about the report to the market that came out of the survey. Now, going to — Excuse me, Dean Sullivan. If an investor got curious about the report and exercised the kind of skepticism you think an investor should, which I think investors do, what would they have done to find out more about the report, you know, questions about the true independence of it, the methodologies, things of that sort? Was there any information available? Chief Judge Kaczynski, there's no allegation that there was any false statement about the overlapping investment. The overlapping directorship is disposed on the website and the minority — Let's say an investor says, okay, they've made the statement. I am probably skeptical because this is capitalism and it's like the running of the bulls, right? So I'm really interested in the survey. Was there anything more available other than the statement? Yes, Your Honor. The website and the corporate records which disclosed the minority stake and which disclosed the overlapping director. But crucially here, the question is whether there was a false statement on which a reasonable investor would have relied. This is not the PeopleSoft case in which a company in the complaint that Judge Alsop allowed to go forward. This is not a case in which false — If they wanted to see whether they were truly independent, if they wanted to sort of test how firm that statement is, there was information on the website that could deconstruct that statement. I can represent that there was, Your Honor, but there's also no allegation that there was not. So this is a thin reed, as Judge Breyer suggested, on which to rest the case. Going back to what might seem the more substantial allegations in the complaint, apart from these words of puffery or animal spirits, the revenue — so-called revenue-pushing allegations. And I want to focus on just how lacking the complaint is in the allegations that fourth-quarter revenues, revenues that should have been recognized in fourth quarter 01, say the plaintiffs, were somehow pushed over into the first quarter of 2002. Now, first of all, and this is crucial, there is no allegation that either the fourth-quarter earnings report or the first-quarter earnings report was false or noncompliant with GAAP in any way. Plaintiff admits repeatedly in the briefs as in the complaint that all the earnings statements were GAAP-compliant. This is not a case in which there's been a misstatement of revenue. And as Judge Cowan, you suggested, it's on the earnings statements that the reasonable investor relies, not some advertising puffery about a survey. Now, in addition to being GAAP-compliant, there is actually an admission by Siebel Systems at the end of the first quarter. They say, looking back at January, they say January was unusual. It was unusually strong. Now, it's absolutely clear in this industry, Your Honors, and this is crucial, that it ordinarily has a hockey-stick quarter, a so-called hockey-stick quarter, referring to the fact that revenues and earnings spike sharply upwards, not only in the last month of the quarter but in the last week of the quarter, that as much as 100 percent of earnings and 50 percent of revenues can come in in the last week of the quarter. This is alluded to by Judge Breyer in excerpts of record page 405. And the reason is that everybody in the software industry knows they can get the best deals if they pressure the sales guys at the end of the quarter. Now, in admitting, as is pled in the complaint, in admitting that January was unusually strong, Siebel was saying, by implication, gee, February and March were kind of weak. We didn't have the hockey-stick. They were giving caution and warning that second quarter wouldn't be as strong. So the revenue-pushing allegations make no sense. If Siebel were trying to get momentum by recognizing more revenue in January than it could have recognized in December, it wouldn't have made that admission. More important, the confidential sources on which counsel for the plaintiffs rely, and I just want to end by saying he relies on Blackstone for, on Black's Law Dictionary for circumstantial evidence. Circumstantial evidence is admissible, of course, but it has to be circumstantial evidence of something. And what's missing from all the confidential sources, 8, 9, and 10, 1, and 4, the confidential sources on which it relies for the supposed December to January push, of these confidential sources not one can point to a single deal that should have closed in December but closed in January, a single shipment that was on the truck in December but was kept in the garage until January, a single contract that should have been signed in December but was pushed off until January, not a single allegation that the confidential sources make, even though we concede you can rely on confidential sources, not a single allegation that the confidential sources can make can support the supposed falsity or scienter as to the revenue pushing. Your Honor, the totality here is less than the sum of the parts, not more than the sum of the parts because of the internal contradiction I mentioned earlier on the April statement. And there are other contradictions as well, but my time has expired. So thank you very much. We believe the decision below should be affirmed. Thank you. Thank you, Your Honor. Very quickly, we pled that the market relied upon the survey. We specifically noted it on Excerpt from Record 265. Your Honor's own experience, you've written about when you wrote a video game review that panned a company and the stock plummeted. Clearly the market responds to comments and analysts. We are not required to drill down to disprove a statement that they make when they say, when we say that they are independent. And there's simply no requirement, as we stated in our brief, to prove a GAAP violation to establish either scienter or a false statement. The law is well established that you can comply with GAAP and still make a misleading statement, and you cannot gain compliance with GAAP and still not have a violation. One is neither necessary nor sufficient. The survey result here was very significant. They touted it. The analysts responded to it. The statements in April of 2002 did the exact same thing, when they say we're doing as well as we did in the first quarter. They didn't disclose that the first quarter results were phonied up by that transfer. And I see I'm out of time, but if Your Honor has any questions, I'd be glad to answer them. There being no questions, thank you. The case is submitted.
judges: Kozinski, Hawkins, Cowen